**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VICTORIA D. MCCULLOUGH | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  20-1595-MAK |
| | : | |
| GATEWAY HEALTH LLC | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                        **September 21, 2021**

A black woman suing her former employer for race discrimination and alleged retaliation leading to her quitting her job just weeks after a pay raise and bonus must adduce evidence of an adverse employment action motivated by racial animus and some form of retaliation. The woman alleges her supervisor unfairly audited her work because of her race prompting her to file an EEOC charge and, after the director of her department learned of her charge, the director created a retaliatory hostile work environment. The alleged retaliatory hostile work environment led her to quit her job when her employer asked for a meeting to discuss a coaching form and she would not attend because she feared meeting with the director would lead to her termination.

Our review of the developed record following over five months of discovery confirms there are no genuine issues of material fact and we dismiss the former employee's claims of race discrimination and retaliation leading to her adverse employment action (her decision to quit her job) rather than attend a human resources meeting. We grant the employer's motion for summary judgment warranted as a matter of law.

I.    **Undisputed Facts**[1]

Victoria McCullough sues her former employer Gateway Health LLC[2] alleging it discriminated against her on the basis of her African American race and retaliated against her after she filed a charge of racial discrimination with the Equal Employment Opportunity Commission.[3]

Ms. McCullough began work at Gateway Health as a Clinical Care Coordinator – Medical Case Manager on December 8, 2014.[4] Gateway Health provides administrative services to Highmark Blue Cross Blue Shield Delaware Health Options, Inc. with regard to its managed healthcare plans under Delaware's Medicaid program.[5] Highmark required Gateway meet certain service level standards.[6] If Gateway's performance fell below an established service level standard, the contract required it to notify Highmark of the deficiency.[7] Once Gateway notified Highmark of a deficiency, Highmark could request a "corrective action plan" requiring, among other things, Gateway to describe the deficiency, its cause, remediation of the deficiency, financial impact, member, provider and/or regulator impact, and  date of compliance to the service level standard.[8] If Highmark approved the corrective action plan, Gateway implemented the plan and provided Highmark with progress reports in satisfying the corrective action.[9]

Ms. McCullough primarily worked from her home and rarely or never went into Gateway's Wilmington office except for meetings.[10] Ms. McCullough worked in Gateway's "SNIP pod." The parties do not describe a "SNIP pod" is and Ms. McCullough could not, at her deposition, explain what "SNIP" means.[11] But our review of the record leads us to find "SNIP" appears to be an acronym for "special needs integrated pod."[12] The "SNIP" pod handled patient members with two or more chronic illnesses.[13] Ms. McCullough analogized a "pod" to a team, with different pods or teams assigned to different medical areas for patient members like behavioral health, pediatrics, and maternity.[14]

***Ms. McCullough's performance reviews from 2015 to 2018.***

Ms. McCullough challenges the conduct of supervisors Jessica Morgan and Carolyn Stahl.[15] Jessica Morgan supervised Ms. McCullough from September 2016 to October 2018.[16] Tracy Wilhelm supervised Ms. McCullough from October 28, 2018 to March 2019.[17] Carolyn Stahl became Gateway's Director of Care Management beginning in March 2018.[18]

Although the parties do not explain Gateway's reporting structure, we infer Ms. McCullough directly reported to Ms. Morgan and, later, Ms. Wilhelm, who in turn reported to Ms. Stahl when she became the Director of Care Management in March 2018. Ms. Morgan and Director Stahl are Caucasian women. Ms. McCullough is an African American woman.

Director Stahl rated Ms. McCullough's overall performance as a "3 – Met All" in the 2015 performance review.[19] The parties do not offer a ratings scale or rubric nor do they explain the details of such a review. Ms. Morgan rated Ms. McCullough's overall performance as a "3 -Met All" for the 2016 year.[20] The parties fail to explain this rating. The parties do not provide us with detail aside from a one-page document containing Ms. McCullough's overall performance reviews for 2015 and 2016.

Ms. Morgan reviewed Ms. McCullough's performance for the 2017 year. We have a more fulsome report of Ms. McCullough's performance in 2017. Ms. Morgan assessed Ms. McCullough's performance as "on track."[21] Gateway required Ms. McCullough to maintain a case load of 45 to 50 members to meet productivity standards to be considered "on track."

Ms. Morgan commented favorably on Ms. McCullough's overall evaluation, including: "Victoria is diligent and thorough in her role as Care Coordinator . . . She is always willing to accept new members and assignments. She is empathetic to member issues and is pre-emptive in helping them overcome barriers. Victoria is persistent when seeking out the best resources and

care for members. … Victoria has been an integral part of the SNIP pod. She is a valuable source or information ... [She] has achieved excellent outcomes for members producing many success stories. [She] sets an admirable example of best practice and expectations for the role of Care coordinator. She is a positive asset to our organization and I look forward to her collaboration in the New Year. ... Thank you Victoria for all you have done to support your team and Health Option members."[22]

Ms. Wilhelm reviewed Ms. McCullough's 2018 performance.[23] Ms. Wilhelm assessed Ms. McCullough's performance as "on track" and commented favorably on Ms. McCullough's overall performance, including: "Victoria is a seasoned and proficient Care Coordinator. ... Victoria is an integral part of the SNIP POD . . . Victoria has achieved excelled outcomes and produced many success stories. Victoria[,] I am looking forward to collaborating with you in 2018 and I would like you to cover me as Supervisor at times . . . ."[24]

Gateway paid Ms. McCullough a raise and bonus every year of her employment and paid an extra bonus in 2018.[25] Gateway never demoted Ms. McCullough.[26]

### *Ms. Morgan audits Ms. McCullough's cases under the Highmark contract in 2017 and 2018.*

Gateway also audited the cases of care coordinators like Ms. McCullough to meet its service obligations to Highmark. Ms. Morgan audited one of Ms. McCullough's cases in April 2017 commenting, "Good Work" and assigned a score of 100%.[27] Ms. Morgan audited another of Ms. McCullough's cases in May 2017 commenting, "see late tasks with missing barrier" but nevertheless assigned Ms. McCullough a score of 100%.[28] Ms. Morgan again audited Ms. McCullough's cases in November 2017 commenting, "I did not find the med rec and where you contacted pcp . . . if I missed let me know and I will fix this" and assigned Ms. McCullough a score of 95%.[29]

4

Ms. Morgan audited Ms. McCullough's cases on April 5, 2018 for the first quarter of 2018. Ms. Morgan noted her "[o]nly concern is [Ms. McCullough] had a call into the 24 hour nurse line and she wasn't called back on 3/26/18" but noted "[n]ice care plans" and assigned Ms. McCullough a score of 100%.[30]

Gateway's Senior Clinical Training Specialist Linzi Hamilton also audited Ms. McCullough's charts. Senior Clinical Training Specialist Hamilton emailed Director of Care Management Stahl on April 6, 2018 to advise she and Ms. Morgan "are having some issues regarding Victoria [McCullough]. We did a mini queue scrub on her to try to find a chart appropriate to audit and discovered many documentation compliance and timeliness issues."[31] Training Specialist Hamilton suggested she and Ms. Morgan "mee[t] with [Ms. McCullough] to review her queue and try to leverage what the issue is to help her be successful for future audits" hoping "if we went thru [*sic*] each chart and talked about what the expectation was referencing our workflows and audit tool, [Ms. McCullough] would get the picture."[32] Gateway does not explain how Ms. Morgan audited Ms. McCullough's cases from the first quarter on April 5, 2018 assigning a 100% score with only one concern noted but the very next day Training Specialist Hamilton advised Director Stahl she and Ms. Morgan "are having issues" with Ms. McCullough after discovering "many documentation compliance and timeliness issues." Ms. McCullough does not allege Training Specialist Hamilton's actions are racially motivated.

The same day Training Specialist Hamilton notified Director Stahl of Ms. McCullough's charting issues, Ms. McCullough asked Director Stahl to be moved to another pod.[33] Ms. McCullough told Director Stahl she believed Ms. Morgan looked through her queue and "tried to find the only case she could give me a bad score on" and Ms. Morgan "is trying to fire me."[34]

Director Stahl denied the requested transfer.[35] Ms. McCullough alleges she reported Ms. Morgan's racially motivated unfair audits to Director Stahl and to Gateway's Human Resources department.[36] She alleges Gateway's Human Resources department essentially ignored her claims regarding Ms. Morgan's alleged racially motivated actions and instead instructed her to "listen to" Ms. Morgan.[37]

Ms. McCullough now swears she believed Ms. Morgan performed racially motivated "unfair audits" because Ms. Morgan did not give Ms. McCullough the allotted thirty days to complete tasks on the chart.[38] Ms. McCullough did not recall the number of Ms. Morgan's unfair audits and does not recall the dates of the audits.[39] She concedes she is not the only care coordinator with audited charts and concedes audits are a standard part of the job.[40] Ms. McCullough claims racial animus motivated Ms. Morgan's audits citing "a couple of comments about 'dreads'" in reference to a client.[41] Ms. McCullough claims during an instant messaging session with all care coordinators, Ms. Morgan made comments about "dreadlocks," offending Ms. McCullough because "black people … wear dreads."[42] Ms. McCullough does not identify when Ms. Morgan made these comments, does not remember what Ms. Morgan said specifically, and did not ask Ms. Morgan what she meant by using the term "dreads."[43] Ms. McCullough believes Ms. Morgan made other racial comments but does not recall a detail about these additional comments.[44]

But a few weeks later in May and June 2018, Ms. Morgan audited one of Ms. McCullough's cases and assigned a 100% score, commenting "[v]ery complete thorough job. Excellent work."[45] Ms. Morgan emailed Ms. McCullough on October 21, 2018 to congratulate her on a report showing Ms. McCullough had 106 cases of which 50 have "ALL the elements required to be engaged as well as matches what you are reporting engaged … THIS IS WONDERFUL and you are 1 or 2 people who have nailed it … KEEP IT UP!!!! NICE JOB Victoria."[46]

### *Training Specialist Hamilton identified deficiencies after auditing*
### *Ms. McCullough's 2018 cases.*

Training Specialist Hamilton audited Ms. McCullough's cases for the period February 6 to April 10, 2018 and assessed two cases with scores of 64% and 71%.[47] Training Specialist Hamilton told Ms. Morgan and Director Stahl she "had a productive meeting" with Ms. McCullough, reviewed the audit scores and charts, and "identified many opportunities for improvement."[48]

Training Specialist Hamilton and Ms. McCullough agreed to allow Ms. McCullough until April 20, 2018 to remedy the deficiencies in her chart review and to then re-audit her chart which "will be the final score for her first quarter."[49] Training Specialist Hamilton re-audited a chart on April 20, 2018, noting it "is as complete as possible" and assigned Ms. McCullough a score of 95%.[50] Gateway characterizes Training Specialist Hamilton's "remedial training" of Ms. McCullough constitutes the "first step in [its] four-step disciplinary plan."[51]

Training Specialist Hamilton audited Ms. McCullough's cases for the period July 18 to October 4, 2018. Training Specialist Hamilton assigned Ms. McCullough a score of 100% on a case commenting, "Wow! What an impressive chart. You have some of the nicest care plans I have seen. Great job, Victoria. Nice use of tasks. Only thing to note is that you have more than 1 goal marked as 'high priority'. Only 1 goal should be high priority at a time for the entire care plan. Great job!"[52] Training Specialist Hamilton audited another of Ms. McCullough's cases for the period September 4 to October 4, 2018, and assigned her a score of 100% commenting, "[v]ery nice chart! Missing a few things but you are still in the 30 day window so please don't forget to send your mailers and document!"[53]

### *Ms. McCullough files a charge of discrimination with the EEOC in November 2018 now missing from the record.*

Ms. McCullough filed a charge of employment discrimination with the EEOC sometime in November 2018 "based on [Ms.] Morgan's racially discriminatory actions in giving unfair audits."[54] Ms. McCullough swore she could not remember the allegations she made in her November 2018 EEOC charge.[55] She swore she repeatedly contacted the EEOC, but could not speak to anyone because of a government shutdown at that time.[56] Ms. McCullough concedes the November 2018 EEOC charge is missing and not in the record.[57] Ms. McCullough does not know what happened to her November 2018 EEOC charge. She swore an EEOC employee by the name of "Mimms"—who she believes is not a "real worker there" and instead an "intern"— "confused [the November 2018] charge "and rewrote my whole charge that I had on Carolyn [Director Stahl] and he put it on Jessica [Ms. Morgan]. He put her on retaliation."[58] Ms. McCullough did not have a retaliation charge against Director Stahl in November 2018 because, by her own admission, Director Stahl did not know of the EEOC charge until December 2018.

Ms. McCullough swore she "called Washington, D.C. because [she] was . . . really upset with [Mr. Mimms] because all this stuff was going on. He had screwed up my whole charge."[59] She swears she spoke to an EEOC "director" who assured her the Commission would "send [her] something" but "[the EEOC] never investigated that charge with Ms. Morgan."[60] Ms. McCullough swore she told the EEOC "director" her November 2018 "was just, like, a big mix-up;" the director sent her a form to withdraw the charge; she "was trying to withdraw the charge [Mr. Mimms] rewrote;" but then swears she did not withdraw the November 2018 charge.[61]

### Ms. McCullough tells Director Stahl about her November 2018 EEOC charge.

Ms. McCullough claims she called Director Stahl in December 2018 to tell her about filing the November 2018 EEOC charge alleging race discrimination based on Ms. Morgan's "unfair audits."[62] Ms. McCullough swears she does not believe she ever again spoke to Director Stahl about the November 2018 EEOC charge.[63]

Ms. McCullough swears she had a "pretty decent relationship" with Director Stahl before December 2018 but after she told Director Stahl about filing the November 2018 EEOC charge, Director Stahl's attitude toward her changed and Director Stahl "started complaining about [her] work a lot"; "[t]alking about [her] queue's mixed up"; and "[her] work was bad all the time."[64]

Ms. McCullough swears after learning of the November 2018 EEOC charge, Director Stahl "started going into my queue" which Ms. McCullough believes never happened before December 2018.[65] Ms. McCullough chose not to depose Director Stahl or anyone at Gateway to determine the scope of Director Stahl's duties, including as Director of Care Management's likely responsibility for overall care management and supervision of care coordinators. Ms. McCullough still believes without supporting evidence Director Stahl did not begin to "go into her queue" until December 2018.

Ms. McCullough alleges Director Stahl's attitude created a hostile work environment. Ms. McCullough swore Director Stahl: "kept at me about by queue, about my work ..."; "pick[ed] on [me] about nothing"; said "your queue's not good. You need to check your queue" and there were no errors when Ms. McCullough checked her queue and asked her supervisor.[66] Ms. McCullough does not recall Director Stahl's words, but understood Director Stahl's comment "your queue is bad" as a verbal warning.[67] Ms. McCullough concedes Director Stahl did not cut her pay, require her to come into the Wilmington office, or impose punishment for her deficient queue.[68]

### *Ms. McCullough applied for a position in Behavioral Health in December 2018.*

Ms. McCullough applied for a position in behavioral health in December 2018.[69] Gateway did not select Ms. McCullough for the position explaining: it did not want her to leave her position which included her presence in a behavioral health facility two to three nights a week; it required a person who could commit to being in a facility two to three days a week and carry a regular caseload which Ms. McCullough could not manage while continuing her work at the behavioral health facility; it had a concern when Ms. McCullough reported she did not want to do home visits or receive referrals; and, it had a concern about Ms. McCullough's report she has a "troubling relationship with previous Supervisors within our company."[70]

Ms. McCullough acknowledged her position included her work two nights a week at a behavioral health facility.[71] She conceded the night work is "probably why [Gateway] didn't want [her] to move. That's why they didn't want me – I believe that's why they didn't want me to do that job [referring to the behavioral health position she applied for in December 2018] because I was the only one that was going out at night and fill in my facility, which was unfair to me, I felt."[72]

### *Training Specialist Hamilton's January 2019 concern with Ms. McCullough's performance.*

Training Specialist Hamilton audited one of Ms. McCullough's 2018 cases on January 24, 2019.[73] Training Specialist Hamilton reported she found significant errors and notified two supervisors the case "is one of the worst cases I have ever seen in my career here. I feel Victoria should be put on corrective action. This is not the first time we have had to fall on the sword for her negligence and it won't be the last if we don't do something serious."[74]

Director Stahl then (within ten days) told Training Specialist Hamilton, Ms. Wilhelm (Ms. McCullough's new supervisor) and Ms. Morgan she "reviewed the extensive gaps identified in the

Highmark Audit for Victoria McCullough's chart," and Human Resources advised a "verbal written coaching form" should be issued to Ms. McCullough given the "coaching and education in the last several months."[75] Director Stahl later told Ms. Wilhelm and Ms. Morgan she discussed Ms. McCullough's performance with the Chief Medical Officer and "he brought a valid point, we need to look at all [Ms. McCullough's] cases to ensure this is not an anomaly. He is concerned about member not receiving [*sic*] services care due to lapses in performance. Can we do a queue review. I know what I am asking and I know how thoughtful we need to be."[76] The parties do not tell us and we cannot find in the record whether Director Stahl, Ms. Wilhelm, or Ms. Morgan completed a review of all of Ms. McCullough's cases to rule out an anomaly.

### *February 2019 training and audits.*

Sometime in February 2019, Director Stahl told Ms. McCullough *all* care coordinators— not only her and not only members of a protected class—"must speak with … trainer, Linzi Hamilton (Caucasian), … pertaining to best practices."[77]  Ms. McCullough swore the meeting of all care coordinators with Training Specialist Hamilton occurred because the state's Medicaid program put Gateway on a corrective action plan.[78] Ms. McCullough swore Director Stahl had a meeting with all care coordinators about the State's performance concerns. Ms. McCullough conceded all care coordinators are audited as "part of the job" and some receive "bad" audits.[79]

Ms. McCullough's supervisor Ms. Wilhelm notified Ms. McCullough of an audit in January 2019. Ms. Wilhelm told Ms. McCullough, "[g]reat job on this case. Definitely a challenge with this member being homeless. So the only thing was a recent med rec needed to be completed. The TOC assessment hasn't been completed but I see you have it as a task to complete. …"[80] On February 24, 2019, Ms. Wilhelm audited one of Ms. McCullough's case in the January 28, 2019 through February 24, 2019 time period. Ms. Wilhelm assigned Ms. McCullough a score of 95%

and commented "Victoria[,] there are still a few things that you need to do with this case prior to 28th of Feb. Please put in medical history and call the PCP – also TOC assessment and complex assessments need to be done by 2/28 to be in compliance."[81]

Ms. McCullough received a raise on March 3, 2019 notwithstanding her concerns.[82]

**March 8, 2019 conversation between Ms. McCullough and Training Specialist Hamilton.**

Ms. McCullough met with Training Specialist Hamilton on March 8, 2019 within a week of her raise and prompted by the training directive from Director Stahl in the wake of the State's concerns with Gateway's performance. Ms. McCullough claims Training Specialist Hamilton told her she would be placed on a corrective action plan and terminated in two months.[83] Gateway denies this allegation on March 8, 2019, contending it did not place Ms. McCullough on a corrective action plan and coaching is not a corrective action plan, but an opportunity to improve performance.[84]

Ms. McCullough swore Training Specialist Hamilton did not give her details about the purported termination and Ms. McCullough did not ask for information.[85] Ms. McCullough does not know who had the power to fire her, but believes Director Stahl and another manager, Diana Rappa-Kesser, "probably" had the power to fire her.[86] She did not identify Training Specialist Hamilton as someone who could fire her but characterizes Ms. Hamilton as a "big deal."[87]

Ms. McCullough swears she told Director Stahl about Training Specialist Hamilton's comment regarding termination in two months. Ms. McCullough swears Director Stahl denied termination and explained the purpose of the coaching form is to provide training and support.[88] When Ms. McCullough told Director Stahl "that's not what [Training Specialist Hamilton] told me" and "[Training Specialist Hamilton] told me that you plan to fire … me," Director Stahl responded, "[w]ell, that's not the plan."[89]

Despite Director Stahl's denial of Training Specialist Hamilton's comment regarding termination, Ms. McCullough testified she believed Training Specialist Hamilton over Director Stahl because "[Training Specialist Hamilton] wouldn't have said that because she had no purpose to tell me that. What did it benefit her to tell me? I think that she was doing what [Director Stahl] told her to do – is tell me to do these things wrong, which I think – about the tasks and stuff, so I think she was letting me know they're going to fire you."[90] Ms. McCullough concedes she has no evidence to support this theory other than Training Specialist Hamilton's alleged comments and her interpretation of Training Specialist Hamilton's motivations.[91]

### *Director Stahl attempts to meet with Ms. McCullough to review a coaching form.*

On March 11, 2019, someone at Gateway completed a "documented coaching form" for Ms. McCullough.[92] Gateway based the need for coaching on: (1) the April 2018 failed quarterly audit performed by Training Specialist Hamilton; (2) the April 10, 2018 remedial training Ms. McCullough received with Training Specialist Hamilton; (3) the January 2019 random review of Ms. McCullough's chart revealing a failed audit, multiple findings of non-compliance with contractual and department timeframes and documentation requirements, failure to provide acceptable care coordination and follow up to a high-risk member; (4) supervisor review of the team and Ms. McCullough's caseload revealing "multiple cases" with documentation and timeframes failing to meet regulatory and departmental standards; and (5) ongoing education provided to the entire team during weekly pod meetings regarding documentation.[93] There is no threat of termination in the coaching form.

Under Gateway's corrective action policy, a "corrective action plan" or "CAP" is "used to address performance, attendance or conduct issues. … Generally, unless immediate termination is warranted, the manager and employee will have one or more documented coaching discussions

regarding performance or attendance issues prior to the employee being placed on a CAP. These coaching sessions will outline the consequences if improvement is not demonstrated."[94] "Coaching" is defined as "[a] documented discussion or notice between management and an employee about unacceptable levels of performance or conduct and the potential consequences of failing to meet performance or behavioral expectations. …"[95]

Director Stahl scheduled a meeting with Ms. McCullough for March 15, 2019 to review the coaching form, but Ms. McCullough called out sick to avoid meeting with Director Stahl "because I was scared to if you want to know the truth."[96] Ms. McCullough testified she did not want to meet with Director Stahl alone "without the cameras or something or somebody in there because I didn't know if she was going to accuse me of doing something I didn't do."[97] Ms. McCullough swore Director Stahl did not physically threaten her, but she "didn't see a reason why someone else couldn't be present. I felt that she [Director Stahl] might do something. I don't know. I just didn't want to meet with her alone. Like I said, her whole attitude toward me changed. I was told that I was going to be fired. I didn't want to go in there and be accused of doing something I didn't do."[98]

### Ms. McCullough resigns on May 19, 2019.

Director Stahl rescheduled the meeting with Ms. McCullough to review the coaching form for March 19, 2019. Ms. McCullough planned to be physically present at Gateway's Delaware office for a care coordination meeting and, because she would already be in the office, Director Stahl scheduled the coaching meeting.[99] In an effort to accommodate Ms. McCullough's concerns regarding Director Stahl, Gateway arranged for Diane Vodzak, from Human Resources in Pittsburgh, to attend the meeting by telephone because Gateway does not have Human Resources personnel stationed in Wilmington.[100]

14

Around 12:30 p.m. on March 19, Ms. McCullough sent an email to Director Stahl and Ms. Vodzak stating: "I have requested an HR person present at my meeting."[101] Director Stahl responded, "Diana Vodzak will be on the line for the meeting as requested."[102] Ms. McCullough immediately rejected this arrangement, telling Director Stahl and Ms. Vodzak, "I am not meeting without a HR person present at the meeting … it is my right."[103]

Ms. McCullough then resigned her employment fifteen minutes later in an email to Ms. Vodzak and Director Stahl stating: "Please take this as my 2 week notice."[104] Ms. McCullough did not meet with Director Stahl on March 19, 2019 and Director Stahl never delivered the coaching form.

Ms. Vodzak immediately emailed Director Stahl saying: "I spoke with Victoria and tried to encourage her to have the meeting with me in the room. She refused and while I was on the phone with her said she was resigning and sent the email below," referring to Ms. McCullough's resignation email.[105] Director Stahl responded to Ms. Vodzak, "I did the same face to face, asked her to come to my office in private, encouraged to take a moment [sic] and think about this, to speak to us first. She refused and left. Said she sent me an email. I would like to just have her be done vs. waiting 2 weeks. Can we do that in anyway?"[106]

Late afternoon on March 19, Ms. McCullough told Ms. Vodzak her last day will be April 5, 2019 "if appropriate, since I was refused a Human Resources Representative physically present at my meeting with Carolyn Stahl."[107] Ms. Vodzak responded, "Thank you, Victoria. As discussed, we do not have HR representation in Delaware but I was more than happy to attend the meeting via phone."[108]

Ms. McCullough contacted Cain Hayes, the President and Chief Executive Officer of Gateway in Pittsburgh, later in the evening of March 19 identifying herself as a care coordinator

15

in the Delaware office and asking to speak to him "pertaining to issues with the management in Delaware."[109] Mr. Hayes assured Ms. McCullough her concerns will be addressed, and referred the matter to Johanna Hower, interim Executive Director for Delaware, and asking Ms. Hower to contact Ms. McCullough.[110]

Ms. McCullough emailed Ms. Vodzak the next morning: "I believe it is inappropriate for me to meet with Carolyn Stahl alone, since I have filed a complaint against her. I also believe it was inappropriate for Carolyn Stahl to come to my working area after I sent the email providing my 2 week notice. She approached me at my work station and asked me if I was going to quit or work 2 weeks (after I already submitted the notice). She proceed [sic] to follow me down the aisle and asking me what did I say [sic]. I believe this was an effort to start a conversation (I ignored her), it was not everyone is [sic] the office business to know the details of our email conversation."[111] There is no evidence Ms. McCullough filed a complaint against Director Stahl as of March 20, 2019. The record contains only Ms. McCullough's assertion she told Director Stahl in December 2018 of the November 2018 EEOC charge alleging race discrimination against Ms. Morgan.

Ms. McCullough spoke to Executive Director Hower on March 21, 2019, confirming in an email: "I previously called HR on Friday 3/15 and was told a person frim [sic] employee relations would contact me. I was unaware Diana was the person until today since she was initially included in an email by Carol Stahl to listen to a meeting on 03/19. I believe management has a monopoly. I was requesting a third party from HR unknown to either party. I received a call from Diana today, she informed me of the decision made by HR, my last day is tomorrow. I will continue with my filed EEOC complaints."[112] Gateway accepted Ms. McCullough's written resignation provided to

Ms. Vodzak, accepted March 22, 2019 as her last day of work, and confirmed it will pay her through April 5, 2019.[113]

Ms. McCullough swore she resigned "because I was scared to go in the office with" Director Stahl.[114] Ms. McCullough denies she quit work and instead "put in [her] two weeks' notice," explaining the difference between the two as "quitting is, I quit. I'm leaving now. Two weeks' notice is the proper way to do it."[115]

### Ms. McCullough filed an EEOC charge on April 10, 2019.

Ms. McCullough filed a charge of discrimination with the EEOC on April 10, 2019 alleging discrimination on the basis of race and retaliation.[116] She claimed discrimination based on race by being subjected to "unfair audits" and receiving "negative audits which would have led to a corrective action plan" in retaliation for complaining of discrimination resulting in her constructive discharge.

Ms. McCullough alleged the earliest date of discrimination began on April 2, 2018 and continued to the latest date, March 19, 2019.  She alleged beginning in April 2018, she complained to Director Stahl and Gateway's Human Resources department about Ms. Morgan's attempts to "fire me and giving me unfair audits." She alleged she filed her November 2018 charge with the EEOC regarding Ms. Morgan's conduct. In addition to what she believed to be Ms. Morgan's racially motivated attempts to fire her and unfairly audit her cases beginning in April 2018, Ms. McCullough additionally claimed Director Stahl subjected her to additional audits in retaliation for filing the November 2018 EEOC charge.[117]

She claimed she resigned her employment with Gateway "due to fear of meeting with Carolyn Stahl alone and of being fired after the correction [sic] action plan as well as not being

able to obtain gainful employment when needed … [which] would also prevent me from submitting my planned application for licensures as a LMSW June 2019 [sic]."[118]

Ms. McCullough provided the EEOC with additional information after filing her April 10, 2019 EEOC charge.[119] She said unnamed peers told her Director Stahl would retaliate against her after learning of the November 2018 EEOC Charge. She also told the EEOC investigator another care coordinator, Jeffrey Wilson, "can attest to the treatment and racial differences in this POD as well as the character of Carolyn Stahl."[120] But Ms. McCullough fails to produce evidence from her unnamed peers or Mr. Wilson to support these assertions.

Gateway responded to the EEOC on May 14, 2019.[121] In an undated communication to the EEOC in "rebuttal," Ms. McCullough told the EEOC, *inter alia*, she left Gateway because Director Stahl bullied her after learning of the November 2018 EEOC charge; she applied for "several positions" while at Gateway, including "promotional, lateral and demotion positions" and only received an interview for one position; and she left her position "due to constructive discharge" because of Director Stahl's bullying and harassment "believed to be in a hostile work environment."[122] The EEOC provided Ms. McCullough with a right-to-sue letter on August 28, 2020.[123]

Ms. McCullough sued Gateway on November 24, 2020 alleging race-based discrimination and retaliation in violation of Title VII[124] and 42 U.S.C. § 1981.[125] Ms. McCullough alleges:

- Ms. Morgan's "unfair audits" beginning in April 2018; and

- Director Stahl's retaliated in the form of increased audits of her cases and a hostile work environment beginning in December 2018 after learning of Ms. McCullough's November 2018 EEOC charge.

Ms. McCullough alleges Gateway constructively discharged her from her employment after she refused to meet with Director Stahl on March 19, 2019 without a representative of Human Resources physically present because she feared Director Stahl's aggression.

## II.   Analysis

Gateway Health moves for summary judgment.[126] It makes six arguments: (1) Ms. McCullough failed to exhaust her administrative remedies on her hostile work environment claim; (2) because she failed to exhaust her administrative remedies on her hostile work environment claim, Ms. McCullough's claim of constructive discharge fails; (3) the hostile work environment claim is not supported by evidence and must be dismissed as a matter of law; (4) she fails to establish a prima facie case for constructive discharge; (5) she fails to establish a prima facie case of racial discrimination and retaliation under Title VII and section 1981; and (6) she fails to adduce evidence to support claims for emotional distress damages and punitive damages.

Ms. McCullough relies solely on her subjective belief of discrimination and retaliation based on race and a racially hostile work environment and fails to cite record evidence disputing facts asserted by Gateway. There is no genuine issue as to a material fact. Gateway is entitled to judgment as a matter of law.

### A.   Ms. McCullough fails to establish a prima facie case of race-based discrimination based on a disparate treatment theory.

Ms. McCullough claims race-based disparate treatment based on Ms. Morgan's racially motivated "unfair audits." Ms. McCullough fails to meet a prima facie case of discrimination under Title VII or section 1981 on this disparate impact theory.

The parties agree the three-step framework of *McDonnell Douglas Corp. v. Green* applies to our analysis of Ms. McCullough's Title VII and section 1981 claims.[127] Ms. McCullough must first establish a prima facie case of discrimination. If she does so, the burden shifts to Gateway to

articulate a legitimate, non-discriminatory reason for its challenged conduct. If Gateway meets its burden, Ms. McCullough must demonstrate Gateway's reasons for its challenged conduct is pretext for discrimination.[128]

Gateway argues Ms. McCullough fails to meet the first step of the *McDonnell Douglas* framework; her burden to establish a prima facie case of race-based discrimination on a disparate treatment theory. To establish a prima facie case of race-based disparate treatment under Title VII and section 1981, Ms. McCullough must show: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination.[129] Gateway challenges the third and fourth prongs of the prima facie case, arguing there is no evidence of an adverse employment action and there are no comparators to establish an inference of discrimination.

An "adverse employment action" is "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"[130] There must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[131]

Ms. McCullough identifies two adverse employment actions under her disparate treatment theory: (1) Ms. Morgan unfairly audited her cases beginning in April 2018 in an effort to terminate her on the basis of race; and (2) she applied for several jobs but Gateway did not choose her for those positions because she believes "people of color had a difficult time being promoted or even being allowed lateral moves" within Gateway.[132]

There is no dispute Ms. Morgan supervised Ms. McCullough from September 2016 to October 2018. Ms. McCullough alleges Ms. Morgan began unfairly auditing her in April 2018. There is no evidence Ms. Morgan ever "unfairly audited" Ms. McCullough's cases. The record instead shows Ms. Morgan audited Ms. McCullough's cases in April, May, and November 2017 and assigned her scores of 100% in April and May and 95% in November. On April 5, 2018, Ms. Morgan assigned a score of 100% in a case audit. On May 16 and June 30, 2018, Ms. Morgan assigned a score of 100% to each case audited. There is no record of Ms. Morgan performing any other audits of Ms. McCullough's cases and there is no dispute Ms. Morgan left her position as Ms. McCullough's supervisor in October 2018.

Training Specialist Hamilton—not Ms. Morgan—audited two of Ms. McCullough's cases on April 10, 2018 assigning Ms. McCullough scores of 64% and 71%. Training Specialist Hamilton and Ms. McCullough agreed to allow Ms. McCullough until April 20, 2018 to remedy the deficiencies in her chart and to re-audit a chart at that time "and that will be the final score for her first quarter."[133] Training Specialist Hamilton re-audited the chart on April 20, 2018, noting the chart "is as complete as possible" and assigned Ms. McCullough a score of 95%.[134] There is no evidence Ms. Morgan initiated this audit. Ms. McCullough does not complain about the conduct of Training Specialist Hamilton, the 95% score she received, or allege racial bias tainted Training Specialist Hamilton's conduct.

To the extent Ms. McCullough complains about the January 24, 2019 audit, Training Specialist Hamilton performed it—not Ms. Morgan who no longer supervised Ms. McCullough then. Training Specialist Hamilton found the audited case "is one of the worst cases I have ever seen in my career here. I feel Victoria should be put on corrective action. This is not the first time

we have had to fall on the sword for her negligence and it won't be the last if we don't do something serious."[135] The evidence does not support attributing this audit to Ms. Morgan.

There is no dispute Gateway paid Ms. McCullough a raise and bonus every year of her employment, including 2018 and 2019, and paid an extra bonus in 2018. Ms. McCullough fails to provide evidence Ms. Morgan's audits beginning in April 2018 altered the terms of her compensation, terms, conditions, or privileges of employment. The evidence instead shows the opposite. Ms. McCullough fails to meet her burden she suffered an adverse employment action due to Ms. Morgan's 2018 audits.[136]

We next address Ms. McCullough's alleged adverse employment action for Gateway's failure to promote her or allow a lateral move. Although not pleaded here or her April 2019 EEOC charge, Ms. McCullough now baldly claims she and other African American women "noticed African Americans were rarely transferred or promoted."[137] She now advances a disparate treatment claim based on a theory she applied for several jobs but Gateway did not choose her for those positions because of her race.[138] To support this claim, she proffers the affidavit of a former employee Ernestine Hull, an African American woman, who held a different position than Ms. McCullough. Ms. Hull's affidavit asserts her belief Gateway denied her and other African American employees, including unnamed employees, promotions into higher paying positions based on race.[139] Ms. McCullough, through Ms. Hull's affidavit, claims there is a "consensus among many African-American employees [Gateway's] practices would not allow them to advance."[140]

Ms. McCullough failed to develop this theory; she did not depose other employees to establish the so-called "consensus" of racial bias at Gateway. Ms. McCullough does not identify what jobs she applied for but did not receive. We can only identify two possible instances: (1) Ms.

McCullough's April 6, 2018 email to Director Stahl requesting to be moved to another pod after Training Specialist Hamilton found two deficient chart audits; and (2) Ms. McCullough's application in December 2018 for a position in behavioral health. In the first instance, Director Stahl denied Ms. McCullough a transfer to another pod. In the second instance, a manager in the behavioral health department selected another candidate for a position.

Ms. McCullough fails to show how either of these instances are adverse employment actions. There is no evidence the denial of either position altered her compensation, terms, conditions, or privileges of her employment with Gateway. There is no evidence either of these positions would have increased her salary or benefits or how the denial of these positions were serious and tangible enough to alter the terms of her compensation, terms, conditions, or privileges of employment.'"[141] There must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[142]

Even if we construed the two instances as adverse employment actions, there is no evidence the actions occurred under circumstances giving rise to an inference of unlawful discrimination. Ms. McCullough proffers the affidavit of Ms. Hull as a comparator. As a comparator, Ms. Hull must be "similarly situated" to Ms. McCullough "in all material respects."[143] Ms. McCullough has the burden of proving Ms. Hull is similarly situated in all relevant respects.[144] Relevant factors used to assess whether a comparator is similarly situated includes the job function, level of supervisory responsibility and salary, whether the two employees had the same supervisor and were subject to the same standards, and engaged in similar conduct "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."[145] Ms. McCullough adduces no evidence to assess whether Ms. Hull is similarly situated

in all relevant respects. Ms. Hull swears she held the position of "outreach representative" supervised by April McCooley.[146] Ms. Hull's affidavit admits she is not similarly situated to Ms. McCullough as the two held different positions and had different supervisors. Ms. McCullough fails to meet her burden.

Ms. McCullough also conceded her night work at a behavioral health facility is "probably why [Gateway] didn't want [her] to move. That's why they didn't want me – I believe that's why they didn't want me to do that job [referring to the behavioral health position she applied for in December 2018] because I was the only one that was going out at night and fill in my facility, which was unfair to me, I felt"[147]and not because of her race. We grant summary judgment to Gateway on Ms. McCullough's race-based disparate treatment claims.

> **B.    Ms. McCullough fails to adduce evidence of a prima facie case of a retaliatory hostile work environment.**

We liberally read Ms. McCullough's amended Complaint as seeking damages for retaliatory hostile work environment because Director Stahl subjected Ms. McCullough to a hostile work environment in retaliation for filing the November 2018 EEOC charge.[148] Ms. McCullough argues she established a prima facie claim for discrimination under a hostile work environment theory, arguing Ms. Morgan's unfair audits (disparate treatment) and Director Stahl's conduct (hostile work environment) evidence race-based discrimination.

A certain amount of untangling is required here. First, race-based harassment creating a hostile work environment is a form of discrimination prohibited by Title VII, 42 U.S.C. § 2000e-2(a) and section 1981.[149] "[A] hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[150] To prevail on a discrimination claim alleging hostile work environment on the basis of race, Ms.

McCullough must show (1) she suffered intentional discrimination because of her race; (2) severe or pervasive discrimination; (3) the discrimination detrimentally affected Ms. McCullough; (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of respondeat superior liability.[151]

Second, another section of Title VII, 42 U.S.C. § 2000e-3(a), makes it unlawful to retaliate against and employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[152] To prevail on a retaliation claim, Ms. McCullough must prove: (1) she engaged in protected activity; (2) Gateway took an adverse employment action against her; and (3) there is a causal connection between her participation in the protected activity and the adverse employment action."[153]

Our Court of Appeals recently cautioned us to be careful to distinguish between a hostile work environment claim and a retaliation claim. To proceed to trial on a hostile work environment claim, Ms. McCullough must show the environment at Gateway "was actually hostile, that the offensive conduct at work was either 'severe' or 'pervasive.'"[154] For a retaliation claim, Ms. McCullough "need not show that [her] working environment in hindsight was actually hostile, only that [she] held an objectively reasonable belief that it was. The difference between these two standards reflects a part of Title VII's purpose to 'encourage employees to report harassing conduct before it becomes severe or pervasive.'"[155]

There is a third type of claim: a retaliatory hostile work environment claim. To prevail on this claim, Ms. McCullough must show: (1) she suffered intentional discrimination because of her protected activity; (2) severe or pervasive discrimination; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances;

25

and (5) a basis for employment liability is present.[156] As Judge Goldberg recently explained, in a retaliatory hostile work environment claim, the "'severe or pervasive' hostile work environment is substituted in place of a materially adverse employment action" required in a traditional retaliation claim.[157]

Neither Ms. McCullough nor Gateway properly identify and, consequently, brief the retaliatory hostile work environment claim.[158] It is clear from Ms. McCullough's amended Complaint she believes Director Stahl subjected her to a hostile work environment in retaliation for filing the November 2018 EEOC charge. Ms. McCullough fails to show the elements of a retaliatory hostile work environment claim. There is simply no evidence of "severe or pervasive" discrimination.

Our Court of Appeals distinguishes between "severe" and "pervasive" as "alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive."[159] To determine whether a work environment is "hostile," we must consider the "totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[160] The retaliatory harassment must be severe or pervasive enough to alter the conditions of employment and create an abusive working environment.[161]

Ms. McCullough alleges Director Stahl subjected her to a hostile work environment in retaliation for filing the November 2018 EEOC charge by:

- changing her attitude toward Ms. McCullough;

- starting in December 2018, "going into [Ms. McCullough's] queue;"

26

- "kept at me about my queue;"

- "pick[ed] on [me] about nothing;"

- criticized Ms. McCullough by saying "your queue's not good. You need to check your queue" and "your queue is bad" even when her "queue" was correct;

- directing training with Training Specialist Hamilton and attempting to deliver a coaching form.

This alleged harassment is neither severe nor pervasive. Assuming Director Stahl made these comments, they are criticisms about Ms. McCullough's work performance. "Offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."[162]

Ms. McCullough does not recall Director Stahl's words, but understood Director Stahl's comment "your queue is bad" as a verbal warning.[163] There is no evidence of disciplinary action. Ms. McCullough concedes Director Stahl did not cut her pay, require her to come into the Wilmington office, or impose any punishment for her deficient queue.[164] Ms. McCullough concedes Gateway audited and coached other care coordinators. There is nothing in the record evidencing Director Stahl's hostility or how or when she "picked" on Ms. McCullough.

There is no evidence Gateway's conduct altered the conditions of Ms. McCullough's employment. She received a raise and bonuses from Gateway every year, including in early March 2019 just weeks before her resignation. She made the decision to resign on March 19, 2019 when she would not accept Gateway's arrangement for Ms. Vodzak to attend the meeting with Director Stahl by telephone because—having put the rabbit in the hat—she feared being alone with Director Stahl. Ms. McCullough produced no evidence to create a fact issue of Director Stahl's harassment.

1.    **Having failed to adduce facts to show a hostile work environment, Ms. McCullough's claim for "constructive discharge" fails.**

Ms. McCullough claims the retaliatory hostile work environment created by Director Stahl became so intolerable as to cause her to resign. Nearly forty years ago, our Court of Appeals recognized "acts of discrimination in violation of Title VII can make working conditions so intolerable that a reasonable employee would be forced to resign."[165] A resignation under such circumstances may be classified as a "constructive discharge." We need not find an employer's specific intent to bring about the discharge. We "need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."[166]

The Supreme Court in 2004 clarified the parties' burdens of proof when a plaintiff asserts a "hostile-environment constructive discharge claim" under Title VII.[167] The Court began with the premise plaintiffs asserting a hostile work environment must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [their] employment."[168] A plaintiff seeking to "advance such a compound claim" "must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response."[169] This is an objective test and "looks to whether 'a reasonable person in the employee's position would have felt compelled to resign.'"[170] Ms. McCullough's "subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge."[171]

We consider a number of factors to determine whether a reasonable employee would have resigned: "whether the employee was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations."[172] Ms. McCullough argues she meets two of these factors: the threat of termination and an unsatisfactory job evaluation.

The undisputed record does not support Ms. McCullough's argument. There is no evidence of a threat of termination. As analyzed, Training Specialist Hamilton allegedly told Ms. McCullough she would be terminated in two months. But Ms. McCullough conceded Training Specialist Hamilton could not fire her and Director Stahl denied Gateway planned to terminate her employment. Ms. McCullough chose to believe Training Specialist Hamilton over Director Stahl. There is no evidence of an unsatisfactory job evaluation. The record shows Ms. McCullough received favorable performance evaluations in 2017 and 2018 and Gateway paid her a raise and bonus every year, including a raise just before her termination. The record shows a coaching form for the audit of one of Ms. McCullough's charts. The entire team received ongoing education regarding documentation.[173]

Ms. McCullough failed to adduce facts of a hostile work environment. "To prove constructive discharge, [she] must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."[174] There is no evidence of severe or pervasive conduct, let alone of greater severity or pervasiveness, a reasonable employee in Ms. McCullough's position would deem hostile.[175]

## III.  Conclusion

Ms. McCullough quit her long-time position with Gateway because she feared her supervisor would eventually fire her. Gateway produced largely highly favorable reviews and awarded her a pay raise and bonus shortly before Ms. McCullough quit. Gateway tried to persuade her to stay employed.

She claims race discrimination motivated one of her supervisors to criticize her work in contractually required audits. She then claims other supervisors retaliated against her for filing an EEOC race discrimination charge leading to the meeting she chose to not attend and instead quit.

Ms. McCullough may feel Gateway treated her unfairly as a black woman; but she needs to adduce evidence of discrimination and retaliation. We find she did not do so even after construing the undisputed evidence in her favor when warranted. We grant the former employer Gateway's motion for summary judgment.

---

[1] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. Gateway Health filed its Motion and brief in support of summary judgment at D.I. 32, 33; SUMF at D.I. 33-1; and Appendix at D.I. 34, 35, 36, and 37. Ms. McCullough filed a response brief at D.I. 38, responded to Gateway's SUMF at D.I. 38-1 and added additional documents to the appendix at D.I. 39. Gateway Health filed its reply brief with additional documents to the appendix at D.I. 44.

[2] The parties agree the proper defendant is Gateway Health LLC, erroneously named in the original Complaint and amended Complaint as Highmark BCBSD, Inc. a/k/a Gateway HealthPlan and Highmark Health Options. D.I. 12.

[3] D.I. 5.

[4] D.I. 38-1, McCullough Response to SUMF ¶ 9. A care coordinator, or medical case manager, assists Highmark members in assessing, "planning, arranging, coordinating, monitoring and evaluation of outcomes and activities necessary to facilitate member access to healthcare services" with the goal to assist Highmark members "with complex medical and/or psychosocial needs have access to high quality, cost-effective healthcare." D.I. 34, Appendix A24.

[5] D.I. 34, Appendix A1-A23.

[6] D.I. 33-1, Gateway SUMF ¶ 18. Ms. McCullough disputes this fact assertion, claiming "there has been no testimony nor has an affidavit been submitted regarding the … contract." D.I. 38-1, McCullough Response to SUMF ¶ 18. Gateway attaches the Declaration of Rhonda Curry, Gateway's Chief Human Resources Officer, who swears the contract included in Gateway's Appendix at A1 through A23 is a true and correct copy of "portions" of Gateway and Highmark Administrative Services Agreement. D.I. 44-2 ¶ 3.

[7] D.I. 34, Appendix A6.

[8] *Id.*

[9] *Id.*

[10] D.I. 38-1, McCullough Response to SUMF ¶ 12.

[11] *See* D.I. 37, Appendix A212.

[12] *See* D.I. 35, Appendix A106.

[13] D.I. 35, Appendix A212-A213.

[14] *Id.*, Appendix A212-A213.

[15] Dianna Rappa-Kesser and Carolyn Stahl, supervised Ms. MsCullough beginning in 2015. D.I. 35, Appendix A43.

[16] D.I. 38-1, McCullough Response to SUMF ¶ 13. At different points in the record, Ms. Morgan is referred to as Jessica Hinkle and Jessica Morgan. One may be her maiden name and the other her married name. For consistency, we refer to Jessica Hinkle/Morgan as Ms. Morgan.

[17] *Id.* ¶ 14.

[18] D.I. 38-1, McCullough Response to SUMF ¶ 15.

[19] D.I. 35, Appendix A78. In 2015, Director Stahl supervised Ms. McCullough as her manager. Director Stahl had not yet become the Director of Care Management.

[20] *Id.*, Appendix A77.

[21] *Id.,* Appendix A72-A76.

[22] *Id.*, Appendix A72-A76.

[23] *Id.*, Appendix A67-A71.

[24] *Id.*, Appendix A67.

[25] D.I. 38-1, McCullough Response to SUMF ¶ 45.

[26] *Id.*

[27] D.I. 35, Appendix A79.

[28] *Id.*, Appendix A80.

[29] *Id.*

[30] *Id.*, Appendix A83.

[31] *Id.*, Appendix A84. Ms. McCullough defined a "queue is, like, your cases." D.I. 37, Appendix A260.

[32] D.I. 35, Appendix A84.

---

[33] D.I. 37, Appendix A169.

[34] *Id.*

[35] D.I. 5, Amended Complaint ¶¶ 20-22.

[36] *Id.*

[37] *Id.* ¶ 21.

[38] D.I. 37, Appendix A240-A-241.

[39] *Id.*, Appendix A241-A242.

[40] *Id.*, Appendix A242.

[41] *Id.*, Appendix A241-A242.

[42] *Id.*, Appendix A242.

[43] *Id.*, Appendix A242-A243.

[44] *Id.*, Appendix A243.

[45] D.I. 35, Appendix 93-A97.

[46] D.I. 37, Appendix A170 (capitalized emphasis in the original).

[47] D.I. 35, Appendix A86-A88, A89

[48] *Id.*, Appendix A91.

[49] *Id.*

[50] *Id.*, Appendix A92.

[51] D.I. 36, Appendix A152-A155; D.I. 33-1, Gateway SUMF ¶ 23. Ms. McCullough disputes Gateway's assertion, arguing there is no testimony or affidavit regarding Gateway's remedial training or its four-step disciplinary plan and lacks a proper foundation.

[52] D.I. 35, Appendix A98-A101.

[53] *Id.*, Appendix A102-A105.

[54] D.I. 38-1, McCullough Response to SUMF ¶ 25. Gateway concedes Ms. McCullough filed a Charge of Discrimination with the EEOC in November 2019. D.I. 8, Answer ¶ 23.

---

[55] D.I. 37, Appendix A245.

[56] *Id.*, Appendix A245-A246.

[57] *Id.*

[58] *Id.*, Appendix A246.

[59] *Id.*

[60] *Id.*

[61] *Id.*, Appendix A247.

[62] D.I. 5 ¶ 24.

[63] D.I. 37, Appendix A258.

[64] *Id.*, Appendix A259-A260.

[65] *Id.*, Appendix A263.

[66] *Id.*, Appendix A263-A265.

[67] *Id.*, Appendix A265.

[68] *Id.*, Appendix A266.

[69] *Id.*, Appendix A171.

[70] *Id.*

[71] *Id.*, Appendix 304.

[72] *Id.*, A304-A305.

[73] Gateway contends Training Specialist Hamilton learned about Ms. McCullough's deficient case through the Highmark's compliance department audit. D.I. 33-1, Gateway SUMF ¶ 28. Ms. McCullough disputes the authenticity of the audit and objects to its lack of foundation. D.I. 38-1, McCullough Response to SUMF ¶ 28. Gateway submitted a declaration of Rhonda Curry, Chief Human Resources Officer, to authenticate the documents included in its appendix. *See* D.I. 44-2.

[74] D.I. 35, Appendix A116-A119.

[75] *Id.*, Appendix A120.

[76] *Id.*, Appendix A121.

[77] D.I. 5, Amended Complaint ¶ 26.

[78] D.I. 37, Appendix A267.

[79] *Id.*, Appendix A268.

[80] *Id.*, Appendix 173.

[81] D.I. 35, Appendix A123-A126.

[82] D.I. 38-1, McCullough Response to SUMF ¶ 33.

[83] D.I. 5, Amended Complaint ¶ 29.

[84] D.I. 8, Answer ¶ 29; D.I. 33-1, Gateway SUMF ¶ 35.

[85] D.I. 37, Appendix A276-A277.

[86] *Id.*, Appendix A233-A234.

[87] *Id.*, Appendix A234.

[88] *Id.*, Appendix A306.

[89] *Id.*

[90] *Id.*

[91] *Id.*, Appendix A306-A307.

[92] D.I. 36, Appendix A156–A157.

[93] *Id.*

[94] *Id.*, Appendix A152.

[95] *Id.*, Appendix A154.

[96] D.I. 37, Appendix A279.

[97] *Id.*

[98] *Id.*, Appendix A279-A280.

[99] *Id.*, Appendix A288-A289.

[100] D.I. 5, Amended Complaint ¶ 35; D.I. 37, appendix A280.

[101] D.I. 37, Appendix A342.

[102] *Id.*, Appendix A341.

[103] *Id.*

[104] *Id.*, Appendix 175.

[105] *Id.*, Appendix A339.

[106] *Id.*

[107] *Id.*, Appendix A334.

[108] *Id.*

[109] *Id.*, Appendix A328.

[110] *Id.*, Appendix A328.

[111] *Id.*, Appendix A176.

[112] *Id.*, Appendix A327.

[113] *Id.*, Appendix A324.

[114] *Id.*, Appendix A295-A296, A310.

[115] *Id.*, Appendix A296.

[116] *Id.*, Appendix A161-A162.

[117] *Id.*

[118] *Id.*, Appendix A162.

[119] *Id.*, Appendix A178.

[120] *Id.*

[121] *Id.*, Appendix A165-A168.

---

[122] *Id.*, Appendix A179.

[123] *Id.*, Appendix A164.

[124] 42 U.S.C. § 2000e *et seq.*

[125] Section 1981 prohibits discrimination on the basis of race and retaliation against those who oppose discrimination. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 354, 355 (2013).

[126] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)). We do not weigh evidence or make credibility determinations. *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[127] 411 U.S. 792 (1973). Employment discrimination claims brought under Title VII and section 1981 are evaluated under the same standards because "the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267 (3d Cir. 2010) (quoting *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009)). *See also Griffin v. Harrisburg Prop. Servs., Inc.*, 421 F. App'x 204, 207 n. 3 (3d Cir. 2011) (the elements of a racially hostile work environment under Title VII and § 1981 are the same). The Supreme Court recently clarified a plaintiff "must initially plead and ultimately prove that, *but for*, race, [she] would not have suffered the loss of a legally protected right" under section 1981. *Comcast Corp. v. Nat'l Assoc. of African American-Owned Media*, 140 S.Ct. 1009, 206 L.Ed 2d 356 (2020) (emphasis added).

[128] *Ellis v. Bank of New York Mellon Corp.*, 837 F. App'x 940, 941 (3d Cir. 2021) (quoting *McDonnell Douglas*, 411 U.S. 792 at 802 (1973)).

[129] *Hernandez v. Wal-Mart*, 844 F. App'x 598, 600 (3d Cir. 2021) (citing *In re Tribune Media Co.*, 902 F.3d 384, 401 (3d Cir. 2018)).

[130] *Anderson v. Mercer Cnty. Sheriff Dep't*, 815 F. App'x 664, 666 (3d Cir. 2020) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).

[131] *Id.* at 666 (quoting *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 761 (1998)).

[132] D.I. 38 at 6, 19.

[133] D.I. 35, Appendix A91.

[134] *Id.*, Appendix A92.

[135] *Id.*, Appendix A116-A119.

[136] Because we find there is no fact issue on the adverse employment action prong, we need not examine the fourth prong of whether the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. Ms. McCullough cites Ms. Morgan's alleged "dread" or "dreadlock" comment. Ms. McCullough chose not to timely depose Ms. Morgan or timely attempt to develop this allegation in the over five months of discovery, relying instead on her conclusory supposition Ms. Morgan's alleged "dreadlock" comment creates an inference Ms. Morgan unfairly audited her cases.

[137] D.I. 38 at 4.

[138] *Id.* at 6.

[139] D.I. 39, Affidavit of Ernestine Hull.

[140] *Id.*, ¶ 9.

[141] *Anderson*, 815 F. App'x at 666 (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).

[142] *Id.* (quoting *Ellerth*, 524 U.S. at 761).

[143] *Ellis*, 837 F. App'x at 941.

[144] *Martinez v. Dep't of Homeland Sec./Div. of State Police*, 2019 WL 1220305, at *8 (D. Del. Mar. 15, 2019).

[145] *Martinez*, 2019 WL 1220305 at *8 (quoting *McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011); *Peake v. Pennsylvania State Police*, 644 F. App'x 148, 151 (3d Cir. 2016) (quoting *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004)).

[146] D.I. 39, ¶¶ 2, 11.

[147] D.I. 35, Appendix A304-A305.

[148] *See* D.I. 5, Amended Complaint ¶ 25.

[149] *Starnes v. Butler Cnty. Court of Common Pleas, 50th Judicial District*, 971 F.3d 416, 428 (3d Cir. 2020) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).

[150] *Starnes,* 971 F.3d at 428 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotations omitted)).

[151] *Castleberry*, 863 F.3d at 263 (quoting *Mandel*, 706 F.3d at 167).

[152] 42 U.S.C. § 2000e-3(a).

[153] *Kengerski v. Harper*, 6 F.4th 531, 536 (3d Cir. 2021) (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006)).

[154] *Kengerski*, 6 F.4th at 537 (citing *Castleberry*, 863 F.2d at 264).

[155] *Kengerski*, 6 F.4th at 537 (citing *Ellerth*, 524 U.S. at 764 and *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

[156] *Komis v. Sect'y of United States Dep't of Labor*, 918 F.3d 289, 293 (3d Cir. 2019); *Anselmo v. City of Philadelphia*, 2021 WL 308132, at *15 (E.D. Pa. Jan. 29, 2021). A claim for retaliatory hostile work environment is not settled in this Circuit. For example, in *Briggs v. Temple Univ.*, 339 F.Supp.3d 466 (E.D. Pa. 2018), Judge Surrick identified the additional element requiring a plaintiff to show she suffered a materially adverse action in relation to the hostile work environment. *Id.* at 506.

[157] *Anselmo*, 2021 WL 308132, at *15 (citing *Hare v. Potter*, 220 F. App'x 120, 131–32 (3d Cir. 2007); *Komis v. Perez*, 2014 WL 3437658, at *2 (E.D. Pa. July 15, 2014)). In *Barnes v. Shell Exploration and Production Co. Appalachia*, 2021 WL 2106422, *7 (M.D. Pa. May 25, 2021), Judge Brann noted the difference "some courts find the 'usual discriminatory hostile work environment framework applies equally to claims of retaliatory hostile work environment,' but others have also accurately acknowledged that the 'law of retaliatory hostile work environments remains somewhat unsettled.'" *Id.* (quoting *Anselmo*, 2021 WL 308132 at *15 and *Smith v. RB Distribution, Inc*., 498 F.Supp.3d 645 (E.D. Pa. 2020)). Judge Brann also observed, "[a]lthough the parties do not note this issue, there appears to be some disagreement among the District Courts within the Third Circuit as to whether I should apply a 'severe or pervasive' standard in retaliatory hostile work environment cases, or if I should ask whether the hostile environment was materially adverse such that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Barnes*, 2021 WL 2106422, at *7, n. 69.

[158] Gateway expends a significant amount of its brief arguing Ms. McCullough failed to administratively exhaust her hostile work environment claim as required by Title VII. There is no exhaustion requirement for claims under § 1981. *Cheyney State Coll. Faculty v. Hufstedler*, 703 F.2d 732, 737 (3d Cir. 1983). We read Ms. McCullough's claim as one for retaliatory hostile work environment. Her April 2019 EEOC charge checks off the "retaliation" and "race" boxes. After a charge is filed, "the scope of a resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination …'" *Barzanty v. Verizon PA, Inc.*, 361 F. App'x 411, 414 (3d Cir. 2010) (citing *Hicks v. ABT Assoc., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978)). The scope of the original EEOC charge should be liberally construed. *Hicks*, 572 F.2d at 965; *Mondero v. Lewes Surgical & Med. Assocs., P.A.*, 2014 WL 6968847, * 7 (D. Del. Dec. 9, 2014) (quoting *Hicks*, 572 F.2d at 965).

Liberally construing the narrative of EEOC charge, Ms. McCullough's claim of a retaliatory hostile work environment is fairly within the scope of her claims of race-based discrimination. She checked off "race" as the basis of discrimination; the narrative referred to being uncomfortable meeting with Director Stahl alone and resigning because of her fear of meeting alone with Director Stahl; her undated "rebuttal," presumably to Gateway's position statement to the EEOC, Ms. McCullough referred to being bullied and harassed by Director Stahl which Ms. McCullough believed to be a hostile work environment. In *Anjelino v. New York Times*, our Court of Appeals held the employees' hostile work environment claims were fairly within the scope of the EEOC charge where they referred to the term "abusive atmosphere" rather than "hostile work environment." 200 F.3d 73, 93 (3d Cir. 1999). The court found the terms "abusive atmosphere" and "hostile work environment" interchangeable making the sexual harassment charge fairly within the scope of the EEOC charge and rejected the employer's argument the employees failed to exhaust administrative remedies. *Id.* at 94-95. Gateway argues it did not have notice of a hostile work environment claim as evidenced by its May 14, 2019 letter to the EEOC. D.I. 33 at 9. But Gateway had Ms. McCullough's narrative explaining her fear of meeting alone with Director Stahl in March 2019 and explained Ms. Vodzak had been made available by telephone. Gateway chose not to address Ms. McCullough's expressed fear of meeting alone with Director Stahl. We find this argument unpersuasive.

[159] *Castleberry*, 863 F.3d at 264 (citations omitted).

[160] *Id.* (quoting *Harris*, 510 U.S. at 23).

[161] *Komis*, 918 F.3d at 298.

[162] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

[163] D.I. 37, Appendix A265.

[164] *Id.*, Appendix A266.

[165] *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885 (3d Cir. 1984).

[166] *Id.* at 888.

[167] *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004).

[168] *Id.* at 133 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

[169] *Id.* at 134, 147.

[170] *Id.* at 147; *see also Lewis v. Univ. of Pennsylvania*, 779 F. App'x 920, 922 (3d Cir. 2019) (quoting *Suders*, 542 U.S. at 141).

[171] *Mandel*, 706 F.3d at 169 (citing *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992)).

[172] *Id.* at 169-70 (citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010)).

[173] D.I. 36, Appendix A156.

[174] *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 316, n.4 (3d Cir. 2006) (quoting *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244).

[175] *See, e.g. Lampkins v. Mitra QSR KNE, LLC*, 383 F. Supp. 3d 315, 330 (D. Del. 2019) (no reasonable jury could find plaintiff subject to a hostile work environment resulting in constructive discharge).